**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| KEVIN LIMBRICK, | ) | No. CV 14-9692-PLA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND ORDER** |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| Defendant. | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on December 18, 2014, seeking review of the Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments.  The parties filed Consents to proceed before the undersigned Magistrate Judge on December 24, 2014, and February 15, 2015.  Pursuant to the Court's Order, the parties filed a Joint Stipulation on September 1, 2015, that addresses their positions concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under submission without oral argument.

/

## II.

## BACKGROUND

Plaintiff was born on April 20, 1961.  [Administrative Record ("AR") at 165, 169.]  He has past relevant work experience as a truck driver and security screener.  [AR at 30, 69.]

On August 2, 2011,[1] plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that he has been unable to work since May 19, 2003.  [AR at 165-76.]  In a notice dated December 20, 2011, and in another undated notice, plaintiff was found disabled pursuant to his claim for DIB, for a closed period from May 19, 2003, through September 13, 2011.[2]  [AR at 21 (citing AR at 98-99, 105-08).]  He was considered entitled to and received benefits for the period from July 2010 (twelve months prior to the filing date) through November 2011 (two months following his disability cessation date).  [Id.; JS at 2.]  However, plaintiff was found *not* disabled in another undated notice relating to his SSI application.  [AR at 21 (citing AR at 100-04).]  Plaintiff filed a request for rehearing and on February 3, 2012, the ALJ dismissed plaintiff's hearing request as "premature in the absence of an unfavorable reconsideration determination."  [Id. (citation omitted).]  On March 13, 2013, the Appeals Council granted plaintiff's request for review, vacated the dismissal order, and remanded the matter back to the hearing level for further proceedings, noting that the notices sent to plaintiff were "inconsistent and unclear regarding the appeals process."  [Id. (citation omitted).]  The Appeals Council held that plaintiff was entitled to a hearing and proper determination as to both his DIB and SSI claims.  [Id. (citation omitted).]  A hearing was held on June 5, 2013, at which time plaintiff

---

[1]    Although at the hearing the ALJ noted the "August 2, 2011 application" [AR at 54], the ALJ in the Decision reported the application date as July 18, 2011.  [See AR at 21, 31.]

[2]    Following a September 13, 2011, orthopedic consultative examination, the State-agency medical consultant determined that while plaintiff had suffered a "[v]ery significant injury [in 2003] . . . . with MRI evidence of spinal abnormalities and radiculopathy not responding to epidural steroid," and that a 2007 orthopedic assessment "confirms physical signs with planned discography," plaintiff's condition had improved as of September 13, 2011.  [AR at 79.]  He determined, therefore, that plaintiff met Listing 1.04A only for the closed period of May 19, 2003, to September 13, 2011.  [AR at 74-87.]

appeared represented by an attorney, and testified on his own behalf.[3]  [AR at 22, 50-72.]  A vocational expert ("VE") also testified.  [AR at 69-71.]  On July 22, 2013, the ALJ issued a decision concluding that plaintiff was not under a disability from May 19, 2003, the alleged onset date, through July 22, 2013, the date of the decision.  [AR at 21-31.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 15-17.]  When the Appeals Council denied plaintiff's request for review on October 31, 2014 [AR at 1-3], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum

---

[3]   At the hearing, plaintiff's counsel explained that plaintiff was appealing the *decision* which had found him eligible for a closed period of disability, and that this was not a "cessation case." [AR at 54-55.]  Plaintiff understood that as a result, "all the issues" were before the ALJ.  [AR at 55.]

of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld."  <u>Ryan</u>, 528 F.3d at 1198 (citation and internal quotation marks omitted); <u>see</u> <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.   THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995), <u>as</u> <u>amended</u> April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  <u>Id.</u>  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  <u>Id.</u> If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  <u>Id.</u>  If

the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. Id. The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. Id. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.   THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since May 19, 2003, the alleged onset date.[4] [AR at 24.] At step two, the ALJ concluded that plaintiff has the severe impairments of lumbar spine degenerative disc disease/lumbar spine sprain; and status post-bilateral hernia repair. [Id.] She found plaintiff's complaints of urinary incontinence, right hydrocele (status post surgery), and right groin pain to be no more than "slight" impairments having no more than "at most, a minimal effect" on plaintiff's ability to perform basic work-related activities. [AR at 27.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listings, including Listing 1.04. [Id.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[5] to perform light work as defined in 20 C.F.R. §§ 404.1567(b),

---

[4]   The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016. [AR at 24.]

[5]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, (continued...)

416.967(b),[6] and "involving no more than frequent postural movements." [Id.]  At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is able to perform his past relevant work as a truck driver, as actually performed, and as a security screener, as generally performed.  [AR at 30-31.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of May 19, 2003, through July 22, 2013, the date of the decision.  [AR at 31.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she:  (1) found that plaintiff's lumbar spine disc disease did not meet or equal Listing 1.04; (2) failed to consider the combined effects of plaintiff's severe and non-severe impairments on his RFC; and (3) improperly discredited plaintiff's subjective symptom testimony and failed to make proper credibility findings.  [Joint Stipulation ("JS") at 7-8.]

As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

### A.    LISTING 1.04

At step three of the evaluation process, the ALJ must determine whether a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the

---

[5](...continued)
1151 n.2 (9th Cir. 2007) (citation omitted).

[6]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001) (citing Marcia v. Sullivan, 900 F.2d 172, 176 (9th Cir. 1990)).  "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim.  To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ."  Tackett v. Apfel, 180 F.3d 1094, 1099 (9th Cir. 1999) (quoting 20 C.F.R. § 404.1526); see also 20 C.F.R. § 416.926(a).

Plaintiff contends that the ALJ erred in her consideration of whether plaintiff meets or equals Listing 1.04A, Spine Disorders.  [JS at 8-11, 13-14.]

### 1.    Listing 1.04A Criteria

Listing 1.04 requires a finding of disability for an individual who (a) has a "[d]isorder[] of the spine" such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture," (b) that results in compromise of a nerve root or the spinal cord, and (c) which is accompanied by the additional requirements set forth under section 1.04A, 1.04B, or 1.04C.  20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.  Section 1.04A, the section at issue here, requires "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  Id. § 1.04A.

### 2.    Plaintiff's Impairments Do Not Meet the Requirements of Listing 1.04A

Plaintiff contends that he indeed meets the requirements for Listing 1.04A.  [See, e.g., JS at 8-11, 13-14.]  To meet a listing, a claimant's impairments must "meet *all* of the specified medical

1   criteria." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 207 L. Ed. 2d 967 (1990).  "An

2   impairment that manifests only some of those criteria, no matter how severely, does not qualify."

3   Id.

4         Plaintiff's counsel argued in a hearing brief and at the hearing that plaintiff met or equaled

5   Listing 1.04A based on MRI evidence of nerve root compression, polyneuropathy, sensory and

6   motor loss in the lower right extremity, and positive straight leg raising.  [AR at 55, 230-32.]  The

7   ALJ stated at the hearing that in addition to positive straight leg raising, Listing 1.04A requires

8   "atrophy accompanied by sensory reflex loss."  [AR at 55-56.]  Plaintiff's counsel pointed out that

9   there was "motor loss" as evidenced by a 4+/5 motor strength result from a September 8, 2011,

10  examination.  [AR at 56-67 (citing AR at 1534).]  After the ALJ noted that 4+ is "almost five,"

11  plaintiff's counsel argued that _any_ reduction in motor strength is a "loss."  [Id.]

12        Plaintiff refers to the following records to support his contention that his impairment meets

13  Listing 1.04A [JS at 8-11, 13-14]:  a July 2003 examination by Dr. Hunt, a treating orthopedic

14  surgeon who, shortly after plaintiff's work-related injury caused by lifting heavy luggage, found

15  plaintiff's gait with a cane to be slow, deliberate, and antalgic, and with a limp on the right side; his

16  _left_ thigh was one-half inch smaller in circumference than the right; supine straight leg raising was

17  positive bilaterally; and plaintiff's sensation to pinprick and light touch was decreased over the sole

18  of the left foot [AR at 536-38]; a 2003 lumbar spine MRI that showed right lateral disc bulge at L3-

19  L4 causing mild narrowing of the right neural foramen [AR at 709]; a report from October 2003 in

20  which another doctor reported positive supine straight leg raising bilaterally [AR at 768]; a January

21  2007 lumbar spine MRI that showed multilevel broad-based disc protusions effacing the thecal

22  sac, producing bilateral neuroforaminal narrowing, and effacement and encroachment on the

23  exiting nerve roots at L2-L3 through L5-S1 [AR at 1122-23]; a July 2007 examination that noted

24  abnormal toe and heel walk on the left and positive sciatic nerve compression on the right [AR at

25  250-51 (but also noted normal reflexes, and motor examination by manual muscle test showing

26  4+ motor strength in the bilateral lower extremities)]; a 2007 neurological examination by Dr.

27  Capen who found no significant neurological deficits and positive "Waddell signs" [AR at 251],

28  which the ALJ noted was "suggestive of exaggerated pain complaints" [AR at 29; see also JS at

28 n.6]; a May 2008 lumbar spine MRI showing a posterior broad-based annular disc bulge at L3-L4 with mild bilateral neuralforaminal stenosis [AR at 387, 1370]; an August 2008 report by Dr. Cortes who found power weakness on the right of the thoracic/lumbar spine [AR at 1391 (but Dr. Cortes also noted no difference in the measurements of the right and left thighs and calves; no complaint of radicular symptomatology or weakness; negative straight leg raise; and intact sensation)]; a September 2008 note by Dr. Jarminski who found decreased sensation in L5-S1, worse on the right [AR at 1398 (noting "*some* decreased sensation") (emphasis added)]; a September 2011 report by Dr. Jarminski reporting positive straight leg raising bilaterally – both supine and sitting, decreased sensation to pinprick and light touch in the L5 distribution on the right, and 4+/5 motor power on the right [AR at 1533-54 (also noting, however, that plaintiff's "quadriceps are 5/5, strong and equal")]; and a 2011 nerve conduction study that was "abnormal" and suggestive of early mild sensory motor polyneuropathy.  [AR at 1528 (also stating, however, that the results were abnormal due to the fact that testing of the sural nerves was "unobtainable," and noting that the EMG study of plaintiff's upper and lower extremities, and the lumbsacral paraspinous muscles, was otherwise normal).]

The ALJ reviewed the voluminous medical record, including many of the treatment notes and reports cited by plaintiff, as well as others, and determined that although plaintiff has the severe impairment of lumbar spine degenerative disc disease/lumbar spine sprain, the record was inconsistent with a Listing level of severity. [AR at 24-27 (citations omitted).] Substantial evidence of record supports her finding and the records relied on by plaintiff do not satisfy his burden of demonstrating that he meets or equals all of the requirements of Listing 1.04A.  For instance, a May 2011 evaluation by Dr. Moore, found no neurological deficits of sensation, coordination, strength, and gait.  [AR at 26 (citing AR at 1332-42).]  Dr. Moore stated that plaintiff had a normal gait with the ability to walk on his heels and toes; was experiencing no residual complications from his hernia and hydrocele conditions; was not in need of further diagnostic testing or treatment as to those conditions; had only a "minor bulge" at one level of the lumbarsacral spine that was not a surgically correctable type of lesion; had normal tone in the upper and lower extremities and "[n]o fasciculation or atrophy was noted"; and upper and lower extremity strength was "5/5 and

symmetrical." [AR at 1332-42.]  The same physician who reported that plaintiff's motor power was "4+/5" on the right, also reported that plaintiff's quadriceps motor power was 5/5, "strong and equal" on the left and right.  [AR at 1534.]  The ALJ did not err in finding, therefore, that this minimal motor power "loss" is not equivalent to atrophy, or to a loss of neurological function sufficient to meet or equal Listing 1.04A.  [See AR at 27, 57.]  Nor is there any other evidence in the record of significant atrophy or muscle weakness.  The May 15, 2008, examination by a physician responsible for care of plaintiff's 2003 industrial injury on which plaintiff relies as evidence of "atrophy of the right thigh, knee, supra malleolar [sic] and forefoot [as] compared to the left," does not support plaintiff's position.  (JS at 14).  A review of that report shows that the differences in measurement are slight:  knee:  35.8 cm right versus 36.3 cm left; supermalleolar 21.7 cm right versus 22.0 cm left; and forefoot 24.3 cm right versus 25.5 cm left.  [AR at 1249.] With respect to the right and left thigh, the measurements in the Court's copy of the AR (although unclear) appear to reflect 45.7 cm and 46.0 cm respectively.  [Id.]  Moreover, plaintiff's right calf measured 36.0 cm as compared to his "smaller" left calf at 35.6 cm.  The treating physician did not opine that any of these measurements were reflective of muscle atrophy or muscle weakness. [AR at 1244-50.]  Further, a July 30, 2010, examination by Dr. Hakim found that plaintiff's right thigh measured 47 cm as compared to his left thigh at 46 cm, and his right calf measured 39 cm as compared to his left calf at 38 cm [AR at 1290], and as previously noted, Dr. Moore in May 2011 noted no sign of atrophy.  In September 2011, the consultative evaluation revealed that plaintiff walked with a "mildly antalgic limp" without an assistive device; evidenced lower back tenderness, spasm, and reduced range of motion; had positive straight leg raising bilaterally from a supine position, and negative straight leg raising bilaterally from a seated position; there were no abnormalities or deficits of motion in the extremities; the circumference measurements of plaintiff's right and left thighs and calves were identical; plaintiff had grossly intact motor strength in the upper and lower extremities at 5/5; and his sensation in the upper and lower extremities was "well preserved."  [AR at 1414-18.]

Based on the foregoing, the ALJ did not err when she found that the record did not reflect "the requisite deficits of gait or neurological functioning to meet or equal Medical Listing 1.04[A],"

1   as there is no record evidence of motor loss (atrophy with associated muscle weakness or muscle

2   weakness) accompanied by sensory or reflex loss.  [AR at 27.]

3

4   **3.   Failure to Obtain the Testimony of a Medical Expert**

5   Plaintiff contends that although the ALJ was "alerted to the issue of meeting or equaling

6   listing 1.04," the ALJ did not take testimony from a medical expert ("ME") at the hearing, and

7   because the state agency had "originally found a listing level impairment, it was incumbent upon

8   the ALJ to have an ME testify about the issue." [JS at 11 (citing note 2 in HALLEX[7] I-2-6-70; Soc.

9   Sec. Ruling ("SSR")[8] 86-8).]  The Court does not agree.

10   SSR 86-8 states:

11   Any decision as to whether an individual's impairment or impairments are medically
      equivalent of a listed impairment must be based on medical evidence demonstrated

12   by medically acceptable clinical and laboratory diagnostic techniques, including
      *consideration of a medical judgment about medical equivalence furnished by one*

13   *or more physicians designated by the Secretary*.  The Disability Determination
      Services physician's documented medical judgment as to equivalency meets this

14   regulatory requirement.

15   SSR 86-8 (emphasis added).  Note 2 in HALLEX I-2-6-70 states that "[a]n ALJ must obtain

16   testimony from an ME in order to determine whether the claimant's impairments medically 'equal'

17   or are the functional equivalent of a medical listing."  Here, although a State-agency medical

18   consultant had found plaintiff *met* Listing 1.04 for a closed period, it was also determined that after

19   September 13, 2011, the date of a consultative examination, plaintiff showed improvement and

20   no longer met that Listing.  [AR at 74-79.]  There were no medical judgments in the record

21   concerning medical *equivalence* to Listing 1.04 as "demonstrated by medically acceptable clinical

22

23   [7]   The HALLEX is an internal policy manual that does not impose judicially enforceable duties on
      the ALJ.  See Lockwood v. Comm'r Soc. Sec. Admin., 616 F.3d 1068, 1072 (9th Cir. 2010) ("HALLEX

24   does not impose judicially enforceable duties on either the ALJ or this court."); see also Clark v. Astrue,
      529 F.3d 1211, 1216 (9th Cir. 2008) ("HALLEX is strictly an internal Agency manual, with no binding

25   legal effect on the Administration or this court.").

26
27   [8]   "SSRs do not have the force of law.  However, because they represent the Commissioner's
      interpretation of the agency's regulations, we give them some deference.  We will not defer to SSRs

28   if they are inconsistent with the statute or regulations."  Holohan v. Massanari, 246 F.3d 1195, 1202
      n.1 (9th Cir. 2001) (citations omitted).

1   and laboratory diagnostic techniques" and, therefore, no need to obtain testimony from an ME.[9]

2        There was no error in the ALJ's failure to obtain an ME for the hearing to determine medical

3   equivalency.

4

5   **B.   COMBINED EFFECTS OF PLAINTIFF'S SEVERE AND NON-SEVERE IMPAIRMENTS**

6        Plaintiff contends that the ALJ failed to properly consider the effects of plaintiff's problem

7   with urinary frequency and right scrotum pain.  [JS at 14-16.]

8        Specifically, plaintiff had a past history of right groin pain and urinary incontinence that

9   culminated in hydrocele surgery.  [JS at 15 & n.4.]  He underwent two hernia repair surgeries in

10  2004 and noticed that his right scrotum was enlarging.  [See AR at 1420-21.]  In August 2004,

11  plaintiff complained about intermittent incontinence [AR at 335], and in September 2004 he

12  complained of progressive pain and swelling in the right scrotum as well as urgency and urge

13  incontinence.  The doctor diagnosed uninhibited neurogenic bladder and right hydrocele, started

14  plaintiff on medication to relax his bladder, and in February 2005 declared there were no further

15  incontinence episodes.  In May 2005, plaintiff complained of moderate to severe discomfort, and

16  in August 2005 the doctor observed a very large scrotal mass.  [AR at 235-38, 641-45, 764-78,

17  852, 884.]  In November 2005, plaintiff underwent a right hydrocelectomy.  [AR at 972, 977.]  In

18  June 2006, plaintiff felt groin pain shooting into the back region [AR at 284]; in July 2007 he

19  experienced left groin pain radiating down to the left testicle and was asked to consider an

20  ilioinguinal nerve block [AR at 1199, 1201]; in June 2008 pool therapy for the back pain was

21  deferred due to incontinence [AR at 388]; and in August 2008 Dr. Cortes described the problem

22  as an overactive bladder.  [AR at 1390.]  In August 2010, plaintiff reported to Dr. Hakim that he

23  had pain in the posterior aspect of the scrotum and stated his frequency of urination was every

24  1.5-2 hours.  Dr. Hakim thought this was related to the right hydrocelectomy and recommended

25  a nerve block, warm tub baths, and a scrotal binder.  [AR at 1295-98.]  In May 2011, Dr. Gelbard

26  _____

27      [9]   The Court also notes that pursuant to SSR 96-6, an ALJ should obtain an updated opinion on
    equivalence from an ME when in the opinion of the ALJ the evidence in the record suggests that a
28  finding of equivalence may be reasonable.  There is no such evidence in this case.

1  opined that the pain was in the right groin crease and not related to the hydrocelectomy, and

2  instead was due to prostate enlargement. [AR at 1346.] In September 2011, plaintiff complained

3  to Dr. Jarminski of pain in his right scrotum, numbness, and urinary incontinence. [AR at 1532.]

4  However, plaintiff denied incontinence issues when he saw Dr. Bernabe for a consultative

5  examination later that month.  [AR at 1414.]  Plaintiff testified at the hearing that he still had a

6  urination problem in that he had to void as frequently as every 15 to 20 minutes throughout the

7  day.  [AR at 66-67.]

8        The ALJ found that plaintiff did not cite to any particular problems with groin pain or urinary

9  incontinence at the hearing or in his exertional questionnaire. [AR at 26.] She noted that there

10 is no indication that plaintiff "did not recover from his hydrocele surgery or that he has experienced

11 any ongoing complications associated with incontinence or bladder voiding." [AR at 27.] She also

12 observed that although plaintiff complained of urinary *frequency*, tests showed that he was able

13 to completely void his bladder, and no treating or examining source had assessed plaintiff as

14 precluded from work activity due to any urinary function issues.  [AR at 27.]  She also noted that

15 there was no evidence of bladder malfunctioning, testing for urinary frequency suggested an

16 enlarged prostate, and at his September 2011 examination, plaintiff denied any incontinence. [AR

17 at 24-27 (citations omitted).]

18       Plaintiff notes that Dr. Gelbard's opinion that frequent urination was "likely due to prostate

19 enlargement" lends legitimacy to plaintiff's alleged symptoms.  The Court agrees.  Moreover,

20 although the ALJ focused on plaintiff's *incontinency*, finding that it was not a severe impairment,

21 and that the evidence of record supports a finding that any incontinency problems had been

22 resolved, she merely noted in passing the physician's opinion that urinary *frequency* might be

23 related to an enlarged prostate, and did not specifically address this alleged issue and its potential

24 functional limitation on plaintiff's RFC.  [AR at 26.]  Nor did she specifically identify plaintiff's

25 testimony regarding his frequency of urination as testimony that was not credible.  Reddick v.

26 Chater, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ must identify the testimony that was not credible

27 and specify the evidence that undermines his complaints).  [See also Discussion infra Part V.C.]

28 The Court cannot find this failure harmless, especially in light of the fact that at the hearing,

13

1    plaintiff's counsel asked the VE whether an individual with plaintiff's RFC who needed to take a
2    five-minute restroom break three times an hour would be able to perform plaintiff's past relevant
3    work, and the VE testified that "[c]onsistently, over time, day after day, that would eliminate
4    competitive employment."  [AR at 71.]

5         Based on the foregoing, the ALJ erred in failing to properly consider plaintiff's allegations
6    of urinary frequency and the functional limitation, if any, such a condition might impose.[10]  Remand
7    is warranted on this claim.[11]

8

9    **C.    CREDIBILITY**

10        Plaintiff contends the ALJ failed to articulate legally sufficient reasons for rejecting plaintiff's
11   subjective symptom testimony.  [JS at 19-23, 27-28.]

12        "To determine whether a claimant's testimony regarding subjective pain or symptoms is
13   credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028,
14   1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented
15   objective medical evidence of an underlying impairment 'which could reasonably be expected to
16   produce the pain or other symptoms alleged.'"  Id. at 1036 (quoting Bunnell v. Sullivan, 947 F.2d
17   341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may
18   reject the claimant's testimony about the severity of his symptoms "only upon (1) finding evidence
19   of malingering, or (2) expressing clear and convincing reasons for doing so."  Benton v. Barnhart,
20   331 F.3d 1030, 1040 (9th Cir. 2003).  Factors to be considered in weighing a claimant's credibility
21   include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's
22   testimony or between the claimant's testimony and his conduct; (3) the claimant's daily activities;
23   (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the
24   nature, severity, and effect of the symptoms of which the claimant complains.  See Thomas v.

25

26        [10]   The Court expresses no further opinion on the merit of plaintiff's claim of urinary frequency.

27        [11]   Because the matter is being remanded for consideration of plaintiff's allegation of frequency
28   of urination, on remand the ALJ shall also reconsider plaintiff's allegations of groin pain.

14

1   Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also Ghanim v. Colvin, 763 F.3d 1154, 1163

2   (9th Cir. 2014); 20 C.F.R. §§ 404.1529(c), 416.929(c).

3         Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

4   did not find "affirmative evidence" of malingering[12] [see generally AR at 29-30], the ALJ's reasons

5   for rejecting a claimant's credibility must be specific, clear and convincing.  Burrell v. Colvin, 725

6   F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).

7   "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify

8   what testimony is not credible and what evidence undermines the claimant's complaints."  Id. at

9   1138 (quoting Lester, 81 F.3d at 834) (internal quotation marks omitted).  The ALJ's findings "must

10  be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's

11  testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding

12  pain."  Bunnell, 947 F.2d at 345-46 (citation and internal quotation marks omitted).  A "reviewing

13  court should not be forced to speculate as to the grounds for an adjudicator's rejection of a

14  claimant's allegations of disabling pain."  Id. at 346.  As such, an "implicit" finding that a plaintiff's

15  testimony is not credible is insufficient.  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per

16  curiam).

17        Here, the ALJ generally discredited plaintiff's testimony based on a "general lack of medical

18  support," as well as the fact that after his injury in 2003 he "made no further efforts to return to his

19  past work or any other work activity"; that he was able to perform household chores despite

20  testifying he had "very limited physical ability"; that his thoughts did not seem to wander and he

21  answered all questions alertly and appropriately at the hearing; that his allegations of the intensity

22  and persistence of his pain "appear[] exaggerated"; that there was no credible evidence of regular

23  usage of strong medication to alleviate pain that would significantly impair his ability to do basic

24  work activities; and no evidence in the medical record of any significant side effects.  [AR at 30.]

25

26        [12]   The ALJ did note that plaintiff's positive Waddell score reported by one of the consulting
    examiners was "suggestive" of exaggerated pain complaints.  [AR at 29; see also JS at 24-25, 28

27  n.6.]  Although she never made an overt finding that plaintiff was malingering, she did state that
    his pain allegations "appear[] exaggerated."  [AR at 30 (emphasis added).]  No such mention was

28  made regarding plaintiff's allegations of urinary frequency.

1  She also found the "generally mild clinical findings, the gaps in treatment, the lack of any . . .

2  medical source assessing [plaintiff] with functional limitations consistent with his subjective

3  allegations," and plaintiff's "inconsistent statements regarding his ability to perform physical tasks

4  and daily living activities," to support a finding that plaintiff "is not wholly credible." [Id.]

5       The Court notes that several of the ALJ's reasons appear to lack support: e.g., plaintiff

6  does not contend that he had any problems with concentration; plaintiff was regularly found to be

7  temporarily totally disabled between 2003 and 2013; plaintiff received ongoing medical treatment

8  for his impairments; plaintiff's reported activities of daily living were not extensive; plaintiff was

9  prescribed multiple prescription medications such as Vicodin ES, Norco, and Butalbital for his pain,

10 inflammation, and muscle spasms; plaintiff underwent three epidural catheterizations in 2003; he

11 was a candidate for epidural steroid injections in 2012, but they were never authorized; he uses

12 a TENS unit; he has received multiple extracorporeal shockwave treatments; and in early 2012

13 Dr. Jarminski opined that plaintiff's symptomatology appeared to "be slowly getting worse due to

14 the lack of treatment that he desperately needed." [See JS at 27-28 (citations omitted).]  Dr.

15 Jarminski also concluded in 2012 after reviewing a lumbar spine MRI that the disc protrusion at

16 L3-L4 seemed to be more severe and appeared to be actually impinging on the nerve root.  [AR

17 at 1481.]

18      Because the matter is being remanded for consideration of plaintiff's claims of urinary

19 frequency and groin pain, on remand the ALJ must also reconsider plaintiff's credibility and provide

20 specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony if

21 warranted.

22

23                                    **VI.**

24                  **REMAND FOR FURTHER PROCEEDINGS**

25      The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan,

26 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further

27 proceedings, or where the record has been fully developed, it is appropriate to exercise this

28 discretion to direct an immediate award of benefits.  See Lingenfelter, 504 F.3d at 1041; Benecke

1  v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must

2  be resolved before a determination can be made, and it is not clear from the record that the ALJ

3  would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is

4  appropriate.  See Benecke, 379 F.3d at 593-96.

5       In this case, there are outstanding issues that must be resolved before a final determination

6  can be made.  In an effort to expedite these proceedings and to avoid any confusion or

7  misunderstanding as to what the Court intends, the Court will set forth the scope of the remand

8  proceedings.  First, the ALJ on remand shall assess plaintiff's allegation of urinary frequency and

9  groin pain in light of the medical evidence of record.  Second, the ALJ on remand shall reassess

10  plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear

11  and convincing reasons, supported by substantial evidence in the case record, for discounting or

12  rejecting any testimony, including plaintiff's allegations of urinary frequency and groin pain.

13  Finally, based on the foregoing, the ALJ shall reassess plaintiff's RFC and determine, at step four,

14  with the assistance of a VE if necessary, whether plaintiff is capable of performing his past

15  relevant work as a truck driver or security screener.  If he is not so capable, then the ALJ should

16  proceed to step five and determine, with the assistance of a VE if necessary, whether there are

17  jobs existing in significant numbers in the regional and national economy that plaintiff can still

18  perform.

19  /

20  /

21  /

22  /

23  /

24  /

25  /

26  /

27  /

28  /

**VII.**

**CONCLUSION**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  September 21, 2015

_____
                    PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

18